WILLIAM FARROW, JR., appellant,

*v.*

ETHEL FARROW, respondent.

[Argued November 28th, 1905.  Decided June 18th, 1906.]

1. Where the defendant in a suit for divorce is accused of numerous acts of adultery, and the credible testimony fails to prove that she had any disposition to commit the crimes charged, it will not be inferred that she did commit those crimes because it was possible that she might have done so.

2. The testimony of detectives employed by the complainant after the cause is at issue to discover evidence which might. be made the basis of new charges to be presented at the hearing will be received with careful scrutiny.  If their narration of the detection of the defendant in the actual crime of adultery is circumstantially denied by the defendant, is improbable in itself, wholly uncorroborated, and its incidents are inconsistent with the undisputed testimony of disinterested witnesses, it should not be made the basis of a decree for divorce.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Grey, who filed the following opinion:

The bill of complaint and its numerous amendments, and the supplemental bill, set forth alleged adulteries claimed by the complainant to have been committed by the ,defendant wife. The answers of the defendant explicitly deny all the charges and assert, the entire innocence of the defendant.

The complainant has been married to the defendant for something over six years.  The parties have resided during their whole married life in the city of Cape May.  It is undisputed that their marriage relations were uninterruptedly happy until about the opening of the year 1903.  The business of the complainant was that of a Delaware river pilot.  He was ofttimes absent from home for periods running from a week to ten days. Before his marriage he had shown a tendency to drunkenness,

and since his separation from his wife he acknowledges that he has shown the same weakness.

His wife, the defendant, taught music, and was the organist in the Presbyterian church in Cape May. She had lived for so long a time in that city that her personality was familiar to almost every permanent resident.

The first suggestion that anyone entertained any doubts of the propriety of the defendant's conduct was disclosed to her by her husband, with relation to her permitting one Charles Doak to visit at their house, because he said people were talking about his attentions to the defendant. It is undisputed that the complainant, in opening this subject to his wife, declared that he did not doubt her, but wished her to avoid any appearance of intimacy with Doak in order that gossip about them might cease. It is also undisputed that the wife accepted the husband's suggestion obediently—that they together requested Mr. Doak not to call at their house. The testimony does not indicate with precision the source from which the husband received this unfavorable account of his wife, but it is undisputed that his father, who is the chief of police of the city of Cape May, had for some time before the breach between the complainant and his wife habitually spoke of her by using a phrase which declared she was unchaste, without, however, narrating any incident within his knowledge which justified such language.

The complainant and defendant continued their married life, apparently with all confidence in each other, until the month of March, 1904, when the complainant claims that his wife, on going out one evening, told him she would spend the evening at the house of a neighbor. He testifies that she did not go to that place; that he subsequently saw her coming along the street from a different direction, brushing and arranging her dress; that he followed her to their house, and then noticed little pieces of grass upon her dress.

It is substantially undenied that the husband, in a great rage, then forced his wife into an upstairs room, drew a pistol, and with it threatened her with death unless she confessed that she had committed adultery. The defendant was so frightened that she begged for her life, and, as the complain-

ant himself admits, she declared she would confess to anything if only he would not kill her. The complainant appears to have been prevented from further violence by the beggings and pleadings of his wife and of her daughter, a little girl about ten years old. He left the house that night, went to his father's house, where he has since resided, and within a week or two afterwards filed his bill in this suit for divorce, because of the alleged adultery of his wife.

The cause is peculiar because of the frequent changes which the complainant has made since filing his bill of complaint of his accusations against his wife, especially in the addition, after the cause was at issue, of new charges based upon alleged discoveries made by detectives employed by the complainant to find evidence to be used on the trial of this cause. These additional charges were permitted to be added by way of supplemental bill, in order that every accusation which the complainant makes against his wife might be disposed of at one hearing.

The bill of complaint, as originally filed, on April 26th, 1904, charges that the defendant, in May, 1903, at No. 603 Lafayette street, in the city of Cape May, and on different days from January to October, 1903, and April 25th, 1904, at No. 505 Hughes street, in Cape May, committed adultery with Charles Doak.

The house No. 603 Lafayette street is the residence of Mrs. Linda Eldridge; the house No. 505 Hughes street is the residence of the parties to this suit.

The defendant's answer, filed May 11th, 1904, explicitly denies that the offences charged were ever committed at any time or place.

On May 23d, 1904, the complainant, upon notice, obtained an order to amend the bill by adding a charge that the defendant committed adultery with one Harry Oliver, at No. 505 Hughes street, Cape May, on divers days of the year 1903, but did not actually file such an amendment.

The defendant, on June 10th, 1904, filed an amended answer denying the charge of adultery with Oliver.

The cause was on these issues set down for hearing on October 17th, 1904.

On that day the complainant obtained leave to file the supple-

mental bill above referred to, in which he restated the original charges, and in addition thereto alleged that the defendant committed adultery with Charles Doak on the 17th of August, 1904, on the beach at Cape May, between the "Iron Pier" and the "Music Pavilion," and, also, that she committed adultery, on August 24th, 1904, with a person named John Lucas, on the beach, near the steamboat landing, in Cape May City.

The hearing of the cause was postponed until these supplemental charges should be answered.

Answer was filed by the defendant to these supplemental charges on November 7th, 1904. The cause came on for hearing on November 23d, 1904. After testimony had been taken for a day or two, the complainant again, on December 8th, 1904, offered several additional amendments to the bill and supplemental bill, charging new offences. Those which had been brought to the attention of the defendant by the pleadings or by notice some six months before the hearing were admitted as follows: One charging that the defendant committed adultery at No. 603 Lafayette street, Cape May City, in April or May, 1903, with an unknown man. Another that she committed adultery, in March and April, 1904, with one Harry Oliver, at 505 Hughes street, Cape May City; another that the adultery charged in the supplemental bill to have been committed on August 24th, 1904, on the beach near the steamboat landing, in Cape May, with one John Lucas, was in fact committed with a man named William Lewis.

Answer was filed denying all these additional charges and the hearing of the cause proceeded.

The evidence offered by the complainant in support of these various charges arranges itself into two classes. The charges alleging acts of adultery to have been committed on August 17th, on the beach near the music pavilion, and on August 24th, 1904, on the beach near the steamboat landing, originated in and are supported solely by the testimony of the detectives, Wagner and Sague (employed by the complainant after this suit had been brought) for the purpose of discovering evidence which would incriminate the wife as an adulteress, and which

the complainant, when he employed these detectives, hoped and expected to produce on this hearing.

This detective testimony is also differentiated from all the other proof because it is claimed to show that on August 17th and 24th, 1904, the defendant was seen in *flagrante delicto.*

In examining the charges made against the defendant, I will consider, first, those on which the suit was originally brought, and, last, those based on the testimony presented by the detectives.

There are certain general characteristics which attend upon all of the charges made against the defendant by the non-professional witnesses which should, I think, be noticed. None of them testify that they saw the defendant in the act of adultery, or in any such position or relation that the narration of it suggests a reasonable inference that the act of adultery had been committed.

It is well-settled law that it is not necessary to prove that a defendant was seen in the act of adultery in order to justify a decree.

If it be proven that the defendant and the alleged paramour were amorously inclined towards each other, and disposed to commit the crime charged, a showing that they had an opportunity to gratify their desire, under circumstances which indicated that they then committed the crime charged, will support a decree of divorce.

In this case, though many witnesses testify that they saw the defendant in the company of one or more of the alleged paramours, not a single witness (except the detectives) narrates one incident which indicates that the defendant manifested at any time any amorous feeling for any. of the alleged paramours. No caresses, no words or acts of endearment, no assumption of familiarities indicating secret understanding or privileges, are testified to by any witness (other than the detectives) to have proceeded from the defendant towards any of the alleged paramours at any time.

Another peculiarity of the testimony. submitted against this woman is that during the time that the alleged acts of adultery (except those narrated by the detectives) are claimed to have

been happening, the defendant was living happily with her husband, looking after the business of her family, he contented with her and she with him.

Still another oddity is that the accusations of the pleadings, and the proofs brought forward to sustain them, attempt to show that the defendant was in frequent adultery, substantially at the same time, with two men with whom she was known to be acquainted, and with another one (John Lucas or William Lewis), who is not shown to have even been heard of, save on the single occasion of the evening of August 24th, 1904, when (it is claimed by the detectives) he and the defendant were caught in the attempt at adultery on the beach near the steamboat landing under circumstances of shameless publicity. These charges of manifold adulteries could only be true because the defendant is a woman of the most degraded type. Yet it is undisputed that during all this period she was the organist in a church and gave music lessons to little girls, and during the earlier portion of the time, up to March, 1903, she was in happy association with her husband. A feeble attempt was made to prove that she had lost to some extent her social standing, but it was shown that the very persons who narrated incidents now claimed to be inculpatory had continued to send their children to her home, and to receive her in their own, and not a single instance was proven of any extension of social ostracision towards her, unless that course was taken by the family of the complainant, whose head, the chief of polce, had privately, for a long while, denounced the defendant as a bad woman, without giving any incident to support his accusation.

With this notice of some of the general peculiarities of the evidence of the local witnesses, I will examine their testimony given in support of particular charges.

The first charge to which the testimony of local witnesses was directed was that the defendant committed adultery with Charles Doak, in April or May, 1903, at the residence of Mrs. Eldridge, No. 603 Lafayette street, Cape May City. The same charge is repeated in one of the amendments to the bill, wherein adultery at that time and place is related to have been committed with some unknown man. This charge depends entirely

upon the testimony of a single witness, a Miss Hughes, who lived next door to Mrs. Eldridge. Miss Hughes testifies that she, being in her own house, heard voices in conversation in Mrs. Eldridge's house next door. She testifies that these voices were those of Mrs. Eldridge and the defendant, which she recognized, and of an unidentified man. She says she heard all three of them go upstairs, and that she heard the defendant and the man go into the front bedroom; that she heard the mumble of indistinguishable conversation of two voices, and that this mumbling continued for two hours, off and on.

This witness does not testify that the man whose voice she heard was Mr. Doak, whom she appears to have known. She claims to have recognized the voice of the defendant when engaged in a mumbling, indistinguishable conversation, but does not say that she recognized the voice of Mr. Doak, who is claimed by the complainant to have been the man of the occasion. The witness saw nothing of the incidents stated. She bases her whole narrative upon what she says she heard, and this includes nothing but inarticulate mumbling, which had to come through two doors and across a hallway and through the house wall to reach her ears, and she says that what she heard was so indistinct that she could not even distinguish the character of the conversation.

The testimony of a witness who was under such disadvantage in receiving her impressions, which are in themselves so uncertain and indefinite, must be quite unreliable. She saw nothing at all. She heard nothing that was inculpatory. Her characterization of the mumbling does not indicate that the parties whom she overheard were either disposed to or did commit an act of adultery.

It appears, by other witnesses, that the defendant called on Mrs. Eldridge on the afternoon of the day when Miss Hughes, from the next house, heard the sounds which attracted her attention; that the complainant called for the defendant at Mrs. Eldridge's residence, asking if she wanted to go driving, which she declined; that Doak also stopped there that afternoon and sat chatting with the defendant and other persons in the parlor. Nothing in the evidence indicates that there was any

wrongful purpose in the defendant's call upon Mrs. Eldridge that afternoon. It was made in broad daylight, at about the time when the children were coming home from school. Her husband, the complainant, knew, or readily discovered, that the defendant was at Mrs. Eldridge's residence. The defendant did not try to hide her presence there from him, but frankly met him at the door. Her little child, Octavine, nine years old, was with her. Mrs. Eldridge's little girl, somewhat older, was there. Mr. Doak stopped casually, leaving his dog (well known to be his) on the front doorstep, while he went into the parlor. Both the defendant and Doak deny, under oath, that any improper action was intended or performed; both deny they left the parlor or went upstairs that afternoon, and they are corroborated by the testimony of both the children. All the other testimony touching the incidents of that day supports their denials of the defendant's misconduct.

The testimony offered on the part of the complainant as to this charge of adultery, in May, 1903, at No. 603 Lafayette street, Cape May, is quite insufficient to sustain it, either as an allegation of the defendant's adultery with Mr. Doak or with an unknown man. If it suggests a suspicion against the defendant, it is wholly dispelled by the testimony above referred to, presented on the part of the defendant.

The next charge is that the defendant committed adultery with one Harry Oliver. The allegations are that this was in the year 1903, and in the months of March and April, 1904, at the defendant's home, No. 505 Hughes street, Cape May.

The proof submitted in support of this charge is of the least possible weight. No showing is made of any disposition whatever on the part of the defendant to favor the alleged paramour Oliver. Not a witness testifies to any exhibition by the defendant of any amorous preference for or interest in Mr. Oliver, except that one of the detectives testifies that on August 16th, 1904, he saw the defendant at Sewell's Point accept caresses from Oliver. I will discuss this detective testimony hereafter.

About all that is proven regarding this alleged offence with Oliver is that some opposite neighbors claim to have seen Mr. Oliver leave the defendant's house very early one morning, im-

mediately after the defendant had come out of her front door
and looked up and down the street. From this it is argued an
act of adultery between the defendant and the man Oliver must
be inferred.

The inference suggested would be violent in the extreme, in
view of the absence of all proof of an adulterous disposition
between the defendant and Oliver. It is much more likely that
some mistake in the identity of the parties was made by which
the witnesses were misled. Both Oliver and the defendant ex-
plicitly deny that any such occurrence took place, and further
deny that they ever had any improper relations of any kind
at any time or place. Nor is it probable that any woman
who had harbored her paramour over night would, in daylight,
herself come out to the front of her home, openly exhibit
anxiety lest some one should be looking, and then bring him
directly into view of her own front door.

The incidents attending the acquaintance of the defendant
and Mr. Oliver show that they were friends from early child-
hood; that Mr. Oliver visited at the Farrow house, just as many
other people did, with Mr. Farrow's knowledge and approval,
and, except the testimony of Detective Wagner (hereinafter dis-
cussed), not a suggestion is made that there ever was any dis-
position on the part of either the defendant or Mr. Oliver to
overstep the line of decorum.

These charges constituted the whole case on which the com-
plainant originally filed his bill of complaint and the amend-
ment thereto. No other offences are stated in the pleadings
and supported by any testimony, except those brought against
the defendant by the professional witnesses, long after the cause
had been at issue and noticed for hearing.

It is true that there is some testimony, notably that given
by Chief of Police Farrow (father of the complainant), which
is claimed to show that the defendant misconducted herself
with Mr. Doak, in July, 1904.

These incidents are none of them aided by any proof which
would in any way support a charge of adultery. Most of them
narrate instances when the defendant and Mr. Doak were seen

in each other's company in places more or less public. But they state no' attending inculpatory conduct on the part of either of them. Evidence of mere presence together, unless under circumstances which indicate an adulterous disposition, is of no weight to prove adultery. The story of Chief of Police Farrow that he saw Mr. Doak and the defendant on the night of July 28th, 1904, talking together and then walk under the shade of a tree across lots, where they disappeared, is supported by no other testimony. As narrated by Chief Farrow it did not carry a conviction of its truth. He came back to tell it, after he had been once examined and dismissed from the witness-stand. If it were true, it offered no proof leading to an inference that an act of adultery was then committed. It is alleged to have taken place on July 28th, 1904, long after this suit had been commenced, and after the time when Chief Farrow is shown to have manifested active hostility to the defendant. Yet this supposed offence was not named or included in any pleading, although a supplemental bill was filed after July 28th, 1904, which might have charged it as a breach of the marriage vow. Of course, this incident could not be made the basis of a decree, but it might be evidence to support the other charges, if the circumstances narrated were true and showed an adulterous disposition.

Chief Farrow narrated the story that he saw his daughter-in-law and Mr. Doak (who were by his son then being prosecuted for adultery) meet and walk off together into the shade of a tree, within a block or two of the police station. He neither pursued them or called anyone else to do so.

Both the defendant and Mr. Doak deny the whole incident. There is no testimony which in any way supports Chief Farrow's story, and I cannot find that, as told, it is of any significance.

The incident told by Miss Farrow, the sister of the complainant, to the effect that she and others saw the defendant and Mr. Doak leave a skating pond one afternoon together, and go off into the woods, staying half an hour or more, is of the same character. Nothing is narrated touching their behavior towards each other then, or at any other time, which indicated that they

were in any way disposed to commit the crime of adultery. The mere possibility that an adulterous act might possibly have been committed, without any proof that the parties were amorously inclined towards each other, is of no significance.

The only witness who testifies to the skating-pond occurrence is Miss Farrow. She says others saw it, but no others are called, in this hard-fought trial, to corroborate Miss Farrow's testimony. Both the defendant and Mr. Doak deny this incident.

Another accusatory story is told by Mrs. Annie Turner, a colored woman who formerly worked for the defendant. After she had once testified for the complainant to some unimportant incidents, and had been dismissed from the witness-stand, and an adjournment had intervened, she was again called by the complainant, and on this second examination testified that she had seen the defendant and Mr. Doak meet and talk for some time under or near an electric light, and that afterwards the defendant begged her (the witness) not to tell her husband of this meeting. Nothing in the alleged meeting of the defendant and Mr. Doak, as stated by Mrs. Turner, gives the least indication that any criminal intent existed. No statement is made that on that occasion either showed any sign that they were criminally disposed, by either action or speech. They met, it is said, under the glare of an electric light. The alleged request by the defendant that the witness should not tell her husband of this meeting is the only inculpatory incident. If the witness did tell Mr. Farrow all she narrated on the stand, it ought not to have excited a suspicion of his wife's guilt. The manner of this witness in telling this story did not assure the listener that she was stating what she actually saw and heard. No other witness supported her, and both the defendant and Mr. Doak deny the whole story.

Several other accusatory incidents of meetings in alleys and stores between the defendant and Mr. Doak have been submitted. None of them, even if true, present incidents which show the existence of an adulterous disposition or purpose. None go to prove that an act of adultery was committed. All of them are denied, so far as they are accusatory, by both the defendant and Mr. Doak.

The court of errors and appeals, in *Osborn* v. *Osborn,* has characterized cases such as this one is, so far as it rests upon non-professional testimony. That court disapproved of a construction of the evidence which would hold "that opportunity is tantamount to guilt," and declared that a decree could not be based upon a crime charged and but half proven. *44 N. J. Eq. (17 Stew.)* *257, 261.*

This principle applies to and controls the estimate which must be made of all the evidence offered in this case which has been heretofore under examination. None of it proves any act of adultery, none of it shows that the conduct or speech of the defendant indicated that she was disposed to commit that crime.

The charges that acts of adultery were committed by the defendant with Mr. Doak on August 17th, 1904, on the beach near the music pavilion, and on the 24th of the same month, on the beach near the steamboat landing, with John Lucas or William Lewis, remain to be considered.

The incident of August 17th, 1904, is told only by Detective Wagner. He was employed by the complainant through a Philadelphia detective agency several months after the charges in the bill of complaint in this cause had been filed and answer thereto had been made, and amended charges had been added and they also answered, and an order made setting the cause down for hearing. His employment was to find evidence which the complainant might use to convict the defendant of the crime of adultery when the hearing of this cause should come on. Wagner came to Cape May on the 15th day of August. He testified that on the evening of August 16th he saw the defendant (whose personal appearance and residence had been described to him by the complainant's solicitor), leave a public entertainment at Sewell's Point, and accept a hugging from Mr. Harry Oliver. This incident, if true, is of considerable significance. It is the only proof in the whole case that the defendant ever showed any amorous feeling for Oliver. It becomes of great importance to ascertain whether Wagner's narrative can convey with it a conviction of its truth. He claims to have made written daily reports of everything that he saw. His report of August 16th was produced and handed to him, and he was asked

to show anything on it referring to any hugging of the defendant by Oliver at that time, and he was unable to do so. The defendant's counsel then called for any report which narrated the hugging, and none was produced, though repeatedly called for.

The concert which Detective Wagner testified the defendant attended at Sewell's Point was a public show. The defendant had lived all her life in Cape May. Oliver was engaged as a car-starter at the most public places in that city. The two were probably better known than the average residents. Detective Wagner, in his testimony given in this cause, admits that he knows that a detective's claim to have discovered the evidence which he sought for needs corroboration. But not one person is called as a witness to aid this story in any particular, or even to show that either the defendant or Oliver was seen at Sewell's Point on the night of the 16th of August.

Detective Wagner further testifies that on August 17th he saw the defendant leave her house in the evening, alone; saw her join Mr. Doak on the boardwalk; they had a short conversation; Mr. Doak left the boardwalk, going toward the shore, the defendant continuing on the boardwalk till she came to Ocean avenue, when she left it and went into one of the beach tents, where Doak joined her. The detective says he was about twenty-five feet from them, under another tent; that he watched the defendant and Mr. Doak caressing each other, from eight o'clock until ten-fifty, and finally saw them commit an act of adultery; that Mr. Doak shortly after went towards Jackson street; that the defendant went alone to the Lafayette Hotel porch, stayed there alone about half an hour, and got home at twelve o'clock at night.

No other witness supports this testimony in any degree. Both the defendant and Mr. Doak say it is false in every particular.

In telling this incident of the night of August 17th, when Detective Wagner says he saw the defendant commit adultery with Mr. Doak, the detective frequently varied in his statements. He testified that the defendant left her house at eight o'clock in the evening, and, again, that it was "six or eight o'clock when

they met;" and, again, "she met Doak at eight-thirty;" that he (Wagner) looked at his watch and put that in his report.

He testified with assurance that a Mrs. Wiley was the defendant's mother, and when confronted with the suggestion that the defendant's mother had been dead for twenty-five years, he readjusted his statement by saying that a next-door neighbor of the defendant had told him that the lady pointed out was her mother.

The defendant first heard of this new charge on October 17th, 1904, in an application for leave to file a supplemental bill. She testified, without qualification, that every incident narrated by Detective Wagner is utterly false, yet she says she has been unable to recall just where she was and what she was doing during the evening of August 17th, but she is certain she was not on the beach under a tent with Mr. Doak. The latter also flatly denies this accusation. The testimony of Mr. Doak's employer and that of a casual visitor prove that during a large part of the time when Detective Wagner says that Doak was continually on the beach with the defendant he was in fact in his employer's store in Cape May.

The testimony of this detective regarding this incident which he says he saw on August 17th shows that for several hours he kept in sight of the defendant and Mr. Doak while their conduct gave strong indications that they were not only adulterously disposed towards each other, but that in all probability they would actually commit the crime of adultery before they parted that night. He had no reason to believe that the complainant's solicitor or the chief of police of Cape May, the father of the complainant, would hesitate, if requested to furnish an additional witness of the defendant's fondness for Doak. If his story was true he would in all *probability* have secured the arrest of the parties in *flagrante delicto*. Though he says he had hours of opportunity, he did not call anyone else to view the evidences of the defendant's unfaithfulness which he says he watched, and he gives no reason for his omission to secure a verification of his observations, though his testimony shows that he knew that usually a detective's testimony needs corroboration.

Detective Wagner also testifies to another act of attempted

adultery which he says he and his comrade, Detective Sague, saw the defendant commit on the night of August 24th, on the beach at the steamboat landing, with a man named John Lucas or William Lewis. Wagner had brought Sague down from Philadelphia in order that both might at the same time discover some evidence of the defendant's adultery, and thus corroborate each other in their testimony when they were called as witnesses in this cause.

Detective Wagner, in his examination-in-chief, testified that the defendant left her house at nine o'clock in the evening of August 24th. On cross-examination he said she left the house at seven-forty. When reminded of this variance, he was entirely willing to change the hour again, apparently seeking rather to adjust his statements into a consistent story than to relate events from an actual recollection of them. Then he tried to explain the discrepancy by stating that the defendant had returned to her house, an entirely new incident. He further testified, in chief, that they saw the defendant meet a young lady (a person not in any way identified) on the boardwalk; saw them take a trolley car for Cape May Point, and go into a pavilion there, where they got drinks and were joined by two men. He says the defendant left by the back way with one of these men, the other woman with another. The detectives followed the defendant. She and her man went up the beach some little distance from the steamboat landing, and there Wagner says they saw the defendant and this man lay down on the sand and open their clothes to commit adultery. He testified that they interrupted them before the crime was actually committed; that the defendant threatened to shoot him (Wagner); that they demanded the man's name, and he replied "William Lewis," of Wilmington. As the supplemental bill, when filed, charged this offence, the man named was alleged to be John Lucas. This was amended at the hearing to charge it to have been William Lewis.

Detective Wagner, on cross-examination, testified that on the 25th of August he saw Mr. Eldrige, the complainant's solicitor, and, speaking of the incident of the evening before, said to him, "We got the woman last night at eleven o'clock."

This incident of the evening of August 24th, 1904, as narrated by the detectives, happened at Cape May Point, about four miles from Mrs. Farrow's home, at about eleven o'clock in the evening. This time and place are of importance in view of the rebutting testimony hereinafter considered.

The testimony of the other detective, Alfred Sague, is confined to the narrative of the events of the evening of August 24th. He came to Cape May as a partner of Wagner to secure evidence to be offered on this hearing which should prove that the defendant was an adulteress. His testimony followed that of Wagner, and he had the opportunity to arrange his narration of times and events to make a consistent story. Sague, however, differs from Wagner in the most essential point of the incident of August 24th, which they both claim to have witnessed, for while Wagner states it in the clearest terms as an interrupted attempt at adultery, Sague declares that the crime was in fact accomplished. Their descriptions of the narrated incident are not fit for recital, but in my view no two truthful persons, whose attention was concentrated on such a performance, could possibly vary so radically in their statement of its details.

There are several other circumstances which attend upon the testimony of these detectives which are worthy of notice. Neither detective in any way identifies either the woman who they say joined the defendant on the boardwalk or either of the men who were their companions at the steamboat landing. They say the man who was with the defendant declared his name was William Lewis, of Wilmington. But they evidently told the complainant's solicitor that the man's name was John Lucas, for that name was the one given in the supplemental bill. No explanation was given for this change of name from John Lucas to William Lewis. No testimony has been given which shows that there ever was such a man as John Lucas or William Lewis, nor has the man said to have been the defendant's partner in the attempted adultery on that night (August 24th) been in any way identified. It is a necessary inference from Wagner's testimony that this man could not have been either Mr. Doak or Mr. Oliver, giving a false name, for Wagner testified that he previously identified Oliver by the Sewell's Point incident on

the 16th of August, and Doak by the incident of August 17th, near the music pavilion. If the man were either Doak or Oliver Wagner would have known him. Neither Wagner nor Sague claims to have known the man Lucas or Lewis. Nor does any evidence in the cause, save the testimony of these two detectives, show that there ever was any such man. He appears to have come into existence upon this occasion only for the purposes of this cause.

The result is that these detectives claim that within eight days they saw the defendant publicly drinking liquor in saloons late at night, and also saw her almost as publicly accept the lecherous embraces of three different men. Not another witness in the cause ever saw any such conduct on the part of the defendant.

In delivering this testimony these detectives did not give the impression that they were narrating incidents seen by them, which they were recalling from their memories. Detective Wagner, the principal professional witness, when closely pressed, on cross-examination, indicated an anxiety to vary and adjust the exact times when he claimed to have seen the defendant to any hour which would make his story consistent.

These incidents, as the detectives present them, were not discovered by penetrating hidden resorts; they say they took place at times and under circumstances when corroboration, by the arrest of the guilty parties, or by calling the attention of the by-standers, who were readily accessible, would have established the complainant's case, which the detectives were employed to support, and which they knew would probably need the aid of non-professional witnesses. Take the incident of the evening of August 24th. The detectives say it took place within three hundred yards of a hotel porch, on which twenty-five or thirty people were sitting. If it ever happened, nothing would have been easier or more natural for the detectives who were employed to prove the defendant's guilt than to have arrested both the defendant and her paramour, and to have called the attention of disinterested by-standers to the evidence of their crime. Nothing of this kind was attempted. Detective Sague testified that the reason they did not call the attention of the people at

the Delaware Bay House to the defendant's crime was that they did not want to expose the woman, &c.—a claim of delicate consideration for the defendant, which is wholly inconsistent with his threat to "bat her in the face," which he says he made to her that evening, in response to her threat to shoot him.

Not one witness in any degree supports the improbable narrations of these detectives, and I am unable to accept them as credible testimony. This result I have reached without considering the rebutting evidence presented on the part of the defendant.

When that testimony is examined it conclusively shows that the detective story of the accusing incident of August 24th is a fabrication. In the first place, the defendant, in the most explicit terms, denies each and every detail of that story. It is also proven, by the undisputed testimony of disinterested witnesses, that it had been arranged that a vocal concert should be given at the Stockton Hotel, in Cape May, on the night of August 25th, 1904. Mrs. Farrow, the defendant, was invited to attend a rehearsal for that concert, which was to be held at the Ebbitt House on the evening of August 24th, at which rehearsal it was desired that Mrs. Farrow should supply the accompaniment on the piano. She was, at half-past eight to half-past nine on the evening of August 24th, called out of her house to come into the Glenwood House, next door, to answer a telephone message from the manager of the Ebbitt House, inviting her to come that evening to that house for a rehearsal. She went into the Glenwood House and answered the message, declining the invitation because she had a wounded hand. Thence she went home and sat on her own porch with a Mrs. Wiley and her daughter until about ten o'clock in the evening, when her daughter, Octavine Ware, came home, and then Mrs. Farrow's daughter and Mrs. Wiley's daughter went for ice cream, leaving Mrs. Farrow on her home porch with Mrs. Wiley. At about twenty minutes after ten the children returned with the ice cream to Mrs. Farrow's porch, where she and Mrs. Wiley still were. The ice cream was eaten at Mrs. Farrow's house, and she was still there when Mrs. Wiley and her daughter retired to bed at eleven o'clock that

evening. That is the very hour at which Detective Wagner testified he told the complainant's solicitor (speaking of his claim to have seen her, the defendant, about to commit adultery with William Lewis at Cape May Point) "we got the woman last night at eleven o'clock."

There is no reason to doubt that the defendant's witnesses have accurately fixed her presence at her home in Cape May during the whole of the period when the two detectives falsely testified that she was at Cape May Point, four miles away. The defendant's witnesses are entirely disinterested. They testify without hesitation and with entire frankness. They show, I think, that the detective testimony, which cannot have been given under mistake, is a fabrication without foundation in truth.

Reviewing the whole of the testimony on the part of complainant, it may, I think, be justly said that so far as the incidents narrated are credible they are lacking in force to support a conviction that the defendant has been guilty of the crimes charged; and so far as those incidents would, if credible, prove the complainant's case, they are shown to be entirely unworthy of belief. This view leads to the rejection of the whole of the detective story, for the demonstration that they created a false story regarding the incident of August 24th must be taken to prevent the acceptance of all their testimony in the whole case.

I will advise a decree dismissing the complainant's bill, with costs.

*Mr. Howard Carrow,* for the appellant.

*Mr. James M. E. Hildreth* and *Mr. Charles H. Edmunds* (of the Philadelphia bar), for the respondent.

PER CURIAM.

The decree appealed from is affirmed, for the reasons stated in the opinion filed in the court of chancery by Vice-Chancellor Grey.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, GREEN, GRAY, DILL—12.

*For reversal*—REED, VROOM—2.